Filed 12/20/17 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF GRASS VALLEY, as Successor Agency, etc., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> MICHAEL COHEN, as Director, etc., <br><br> Defendant and Appellant. | C078981 <br><br> (Super. Ct. No. 34-2013-80001580-CU-WM-GDS) <br><br> SECOND MODIFICATION OF OPINION |

THE COURT:

Due to a typesetting problem, the modification filed on December 19, 2017, contained an error.  Accordingly, the opinion filed November 20, 2017, is further modified as follows:

1.     On page 6, the paragraph immediately following the heading "*The Goods and Services Claim*" is deleted and rewritten so that it now reads in full:

The trial court issued a writ commanding the Department to consider whether certain transfers under the 2011 Omnibus Agreement ($307,161 at issue herein) were for "goods and services" as that phrase is used in section 34179.5, subdivision (b)(3).  That subdivision defines a relevant transfer in the negative as "the transmission of money to another party that is *not in payment for goods or services*."  (Italics added.)  As we will explain, we agree with the Department's contention in its cross-appeal that the issuance of the writ for that purpose was error, as the City never asked the Department to consider that point during the administrative meet and confer process.

This modification does not change the judgment.

FOR THE COURT:


_____/s/_____
Hull, Acting P. J.



_____/s/_____
Mauro, J.



_____/s/_____
Duarte, J.

2

Filed 12/19/17 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF GRASS VALLEY, as Successor Agency, etc., et al.,<br><br>        Plaintiffs and Appellants,<br><br>    v.<br><br>MICHAEL COHEN, as Director, etc.,<br><br>        Defendant and Appellant. | C078981<br><br>(Super. Ct. No. 34-2013-80001580-CU-WM-GDS)<br><br>MODIFICATION OF OPINION AND DENIAL OF PETITIONS FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Plaintiffs and appellants City of Grass Valley et al. and defendant and appellant Michael Cohen have filed petitions for rehearing with this court. It is hereby ordered that the petitions for rehearing are denied.

1

It is also ordered that the opinion filed herein on November 20, 2017, be modified as follows:

1.      On page 5, delete the penultimate sentence that presently reads: "By January 31, 2012, the RDA paid the City $307,161 pursuant to this agreement."

That paragraph will now read:

The second 2011 agreement at issue (which we refer to as the Omnibus Agreement) provided the RDA would pay the City for several extant projects totaling over $18 million. It, too, anticipated the Great Dissolution and made provision therefor.

2.      On page 6 in the paragraph immediately following the heading "*The Goods and Services Claim,*" the last two sentences are to be deleted. The paragraph will now read:

The trial court issued a writ commanding the Department to consider whether certain transfers under the 2011 Omnibus Agreement ($307,161 at issue herein) were for "goods and services" as that phrase is used in section 34179.5, subdivision (b)(3).

3.      On page 28, add the following new, full paragraph to the end of footnote 12:

In a rehearing petition the City insists it is not a subdivision of the State, or at least that it is a special kind of subdivision not subject to any rule precluding it from raising its contract clause claims. We agree that in some contexts cities--particularly charter cities-- have different attributes than other public entities. But our Supreme Court stated in the seminal Great Dissolution case that California cities " 'are mere creatures of the state and exist only at the state's sufferance.' [Citations.]" (*Matosantos*, *supra*, 53 Cal.3d at p. 255.) So far as Great Dissolution litigation is concerned, we see no reason to delve into and parse the precedential underpinnings of our Supreme Court's statement of the law on this point--dictum or not--as the City asks us to do.

2

4.	On page 14, add the following new, full paragraph to the end of footnote 9:

In a request for modification we treated as a rehearing petition, the Department in part asks that we hold that a request for funding for highway projects can be included on a subsequent ROPS, and the City has no quarrel with this suggestion in the abstract. But to the extent the Department suggests the City must start from square one, that is, file a new ROPS to raise issues regarding the highway funds at issue in this case, we disagree. As the City contends, the Department must give the City a new hearing on its clawback determination using the new definition of an "enforceable agreement" relating to highway projects.

These modifications do not change the judgment.

FOR THE COURT:


_____/s/_____
Hull, Acting P. J.


_____/s/_____
Mauro, J.


_____/s/_____
Duarte, J.

3

Filed 11/20/17 (unmodified version)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF GRASS VALLEY, as Successor Agency, etc., et al., | C078981 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2013-80001580-CU-WM-GDS) |
| v. | |
| MICHAEL COHEN, as Director, etc., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen H. Sumner, Judge. Reversed in part and affirmed in part. The judgment is reversed with directions to recall the writ, and the matter is remanded with directions.

Colantuono, Highsmith & Whatley, Michael Colantuono, Jennifer Louise Pancake and Matthew T. Summers, for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Marc A. LeForestier, Deputy Attorney General and Nancy J. Doig, Deputy Attorney General, for Defendant and Appellant.

1

In yet another case arising out of the "Great Dissolution" of redevelopment agencies (RDAs) in California (see *City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461, 1462-1463 (*Pasadena*)), the City of Grass Valley (City) appeals from a judgment denying in part its petition for writ of mandate. The City, which is also the successor agency for its former RDA, sought to compel the Department of Finance (Department) to recognize the enforceability of certain agreements involving that RDA.

The Department cross-appeals from a part of the judgment commanding it to consider whether certain expenditures fall under a "goods and services" provision, claiming the City's failure to raise this issue in an administrative forum precludes the relief granted by the trial court. We agree with the Department on that point and shall reverse with directions to recall the writ granting the City partial relief. However, based on the retrospective application of postjudgment legislation, we will direct the trial court to issue a new writ commanding the Department to consider the City's claim regarding a highway project agreement. We otherwise affirm the judgment.

## BACKGROUND

Given the many RDA cases this court has decided, due to the designation of Sacramento County as the venue for such disputes (Health & Saf. Code, § 34168, subd. (a)[1]; see, e.g., *City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 491, fn. 1 (*Brentwood*); *Cuenca v. Cohen* (2017) 8 Cal.App.5th 200 (*Cuenca*); *City of Tracy v. Cohen* (2016) 3 Cal.App.5th 852 (*Tracy*); *City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293 (*Emeryville*)), its basic implementing mechanisms are well understood by the parties.

---

[1] Further undesignated statutory references are to the Health and Safety Code.

It suffices to say that in June 2011, the Legislature enacted statutes that barred RDAs from entering into new obligations, provided a process for dissolving the then-extant RDAs, and for ascertaining their outstanding "enforceable obligations." (See *Pasadena*, *supra*, 228 Cal.App.4th at p. 1463.) This reflected a state policy to curtail perceived abuses of the Community Redevelopment Law (CRL) by which RDAs and their "sponsor" entities (usually cities) that created the RDAs and staffed their boards used an increasing share of local property taxes as "tax increments" (increases in property tax attributable to RDA projects) for their own benefit. (See, e.g., *Cuenca*, *supra*, 8 Cal.App.5th at pp. 209-210; *Tracy*, *supra*, 3 Cal.App.5th at p. 855 & fn. 2.)

Our Supreme Court upheld the law dissolving RDAs (Assem. Bill No. 26 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5), but modified certain deadlines therein, and invalidated a companion law that would have allowed the continuation of RDAs in certain circumstances. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231 (*Matosantos*).) As described by our high court in *Matosantos*, Assembly Bill No. 26 consisted of two principal components, codified in two new parts of the Health and Safety Code. Part 1.8 was the "freeze" provision, effective immediately upon gubernatorial signature on June 28, 2011, and Part 1.85 was the "dissolution component." The latter did not become operative until after the decision in *Matosantos*, which lifted a judicial stay of Part 1.85 and reformed its effective date to February 1, 2012. (See *Matosantos*, *supra*, 53 Cal.4th at pp. 250-251, 274-275.)

After our Supreme Court decided *Matosantos*, the Legislature passed and the Governor signed a law that required an audit of successor agencies to determine whether unobligated tax increment revenues were available for transfer to taxing entities. (See Assem. Bill No. 1484 (2011-2012 Reg. Sess.) adding Stats. 2012, ch. 26, §§ 17, 40.) This due diligence review (DDR) (§ 34179.5, subd. (a)) identified "[t]he dollar value of any cash . . . transferred after January 1, 2011, through June 30, 2012, by the redevelopment agency or the successor agency to [a sponsoring entity] and the purpose of

3

each transfer." (§ 34179.5, subd. (c)(2).) Assembly Bill No. 1484 required the successor agency to submit the results of this audit to the successor agency's oversight board (§ 34179.6, subd. (c)) and to the Department, which had the authority to adjust any amounts in the DDR (§ 34179.6, subd. (d)). The bill did not change the general definition of "enforceable obligations" that had excluded agreements between a former RDA and its creator, with exceptions. (§ 34171, subd. (d)(2) [" 'enforceable obligation' does not include any agreements, contracts, or arrangements between the city . . . that created the [RDA] and the former [RDA]"].)

Assembly Bill No. 1484 clarified the process of winding down the former RDAs. (See *Cuenca*, *supra*, 8 Cal.App.5th at pp. 210-211; *Emeryville*, *supra*, 233 Cal.App.4th at pp. 298-300.) This case in part involves what the parties loosely refer to as "clawbacks." (See §§ 34179.5, subds. (b) & (c), 34179.6, subds. (c) & (d).) This refers to the administrative unwinding (via the DDR) of specified RDA transactions that occurred after the Great Dissolution was proposed in January 2011. The period subject to clawbacks is from January 1, 2011, to June 30, 2012. It includes but is not limited to the approximate six-month period referred to by the parties and described in the legislative history as the "fire sale" of RDA assets, which lasted until the freeze took effect in June 2011. (See *Brentwood*, *supra*, 237 Cal.App.4th at p. 502.)[2]

Sponsor entities or successor agencies may seek judicial review when the Department disapproves the inclusion of items proposed as enforceable obligations in the periodically filed recognized obligation payment schedules (ROPS). (See *Cuenca*, *supra*,

---

[2] "In January 2011, the Governor announced his intention to seek the abolition of [RDAs], leading to the resultant frenzy on the part of former [RDAs] and their sponsoring agencies throughout the state to lock up unencumbered tax increment." (*Tracy*, *supra*, 3 Cal.App.5th at p. 858.) "The 2012 audit process represents a legislative rethinking in light of the resulting scurry on the part of sponsors and their conjoined [RDAs] in response to the announced intention in January 2011 to overturn their lucrative apple cart." (*Brentwood*, *supra*, 237 Cal.App.4th at p. 499, fn. 14.)

4

8 Cal.App.5th at p. 211; *Tracy*, *supra*, 3 Cal.App.5th at pp. 856-857 & fn. 3; *Pasadena*, *supra*, 228 Cal.App.4th at p. 1463 & fn. 3.)

In 1986, the City and its RDA had entered into a "Cooperation Agreement" that explained how the two entities would interact, but contained no substantive terms, that is--as the City conceded in the trial court--no specific loans or services were identified. The trial court aptly called it an "umbrella" agreement.

On January 17, 2011--during the so-called fire sale period--the City and its RDA entered into two new "Cooperative Agreements," designed to try to insulate certain transactions from the looming Great Dissolution.

One 2011 agreement pertained to a highway project (Dorsey Project). In part, this agreement (Dorsey Agreement) provided the RDA "will pay for or reimburse the City for actions undertaken and costs and expenses incurred for and on behalf of the [RDA] or otherwise in furtherance of the redevelopment of the Dorsey Project." The Dorsey Agreement anticipated the Great Dissolution by describing what would happen if the RDA were no longer authorized to function "pursuant to state law." The agreement provided the RDA would transfer some $5 million to the City, payable from tax increments or other lawful sources. By January 31, 2012, the RDA had transferred $695,000 in tax increment money to the City under the Dorsey Agreement.

The second 2011 agreement at issue (which we refer to as the Omnibus Agreement) provided the RDA would pay the City for several extant projects totaling over $18 million. By January 31, 2012, the RDA paid the City $307,161 pursuant to this agreement. It, too, anticipated the Great Dissolution and made provision therefor.

5

The Department determined these agreements were not enforceable obligations because they were agreements between an RDA and its organic City. (See § 34171, subd. (d)(2).) Ultimately, the Department required the City to transfer certain money to the County Auditor-Controller.[3] The City paid under protest.

Other facts will be provided as necessary in the Discussion, *post*.

## DISCUSSION

We discuss the issues in a different order than that presented by the parties.

## I

### *The Goods and Services Claim*

The trial court issued a writ commanding the Department to consider whether transfers under the 2011 Omnibus Agreement (the $307,161), were for "goods and services" as that phrase is used in section 34179.5, subdivision (b)(3). That subdivision defines a relevant transfer in the negative as "the transmission of money to another party that is *not in payment for goods or services*." (Italics added.) As we will explain, we agree with the Department's contention in its cross-appeal that the issuance of the writ for that purpose was error, as the City never asked the Department to consider that point during the administrative meet and confer process.

The City first raised this issue after the trial court's adverse tentative ruling, and after the trial court had issued a decision in another case addressing goods and services (the judgment later affirmed in *Brentwood*, *supra*, 237 Cal.App.4th 488). The trial court found the City's failure to raise the issue with the Department via its meet and confer process barred its claim. However, instead of dismissing the claim, the trial court

---

[3] We bear in mind that the wisdom or value to the City of these projects has no effect on our legal analysis. (See *Emeryville*, *supra*, 233 Cal.App.4th at p. 301, fn. 3 ["the details and wisdom of these projects are not relevant"].) Both of those agreements explicitly stated they were not for the benefit of any third parties.

6

remanded the issue to the Department, without limiting the Department's discretion to find the claim came too late or whether the money was or was not paid for relevant goods and services.

Although we agree with the trial court that the City's failure to exhaust an available administrative remedy precluded the court from considering the issue, we hold that remanding the issue to the Department under these specific circumstances was error.

Section 34179.6, subdivision (e) provides in part that certain parties "*may request to meet and confer with the department to resolve any disputes* regarding the amounts or sources of funds identified as determined by the department. The request *shall be made within five business days* of the transmission . . . of the department's determination, decisions, and explanations and shall be accompanied by an explanation and documentation of the basis of the dispute. *The department shall meet and confer with the requesting party* and modify its determinations and decisions accordingly. The department shall either confirm or modify its determinations and decisions within 30 days of the request to meet and confer."**[4]** (Italics added.)

" 'Shall' is mandatory and 'may' is permissive." (§ 16.) The use of "may" and "shall" in the same statutory provision is illuminating. (See *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 ["It is a well-settled principle of statutory construction that the word 'may' is ordinarily construed as permissive, whereas 'shall' is ordinarily construed as mandatory, particularly when both terms are used in the same statute"].) It shows that the meet and confer process is permissive for a challenger, which "may" choose to seek administrative review, whereupon it must submit any legal and

---

**[4]** As the City also points out, section 34177, subdivision (m)(1) provides in part that in certain cases: "Within five business days of the department's determination, a successor agency *may request* additional review by the department and an opportunity to meet and confer on disputed items . . . ." (Italics added.)

7

factual claims for consideration within five days of an adverse determination by the Department.  When this is done, the Department "shall" engage in the "meet and confer" process, that is, it shall consider and act on the dispute within 30 days.

But the permissive "may" in the statute does not make the administrative process *optional* if a party wants to seek judicial relief, as the City contends.

> "Administrative proceedings should be completed before the issuance of a judicial writ.  The rule is not a matter of discretion; compliance is a jurisdictional prerequisite to judicial review.  [Citation.]  ' "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course.'  [Citation.]  *Moreover, the exhaustion doctrine applies even where the administrative remedy is couched in permissive language*."  (*California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1489, italics added; see *Morton v. Superior Court* (1970) 9 Cal.App.3d 977, 982 ["a city employee is not required to file a grievance if he does not wish to do so, but he must first pursue this administrative remedy before resorting to the judicial process"]; see also *County of Los Angeles v. Farmers Ins. Exchange* (1982) 132 Cal.App.3d 77, 85-87 [because the insurance commissioner could grant a remedy, claimants could not bypass available administrative process].)

Our Supreme Court has said that "exhausting all possibilities for relief at the administrative level is generally a prerequisite to obtaining judicial review" (*State Bd. of Chiropractic Examiners v. Superior Court* (2009) 45 Cal.4th 963, 972-973) and "[e]xhaustion of administrative remedies usually contemplates termination of all available, nonduplicative administrative review procedures" (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1151).[5]

---

[5]  To the extent the City contends exhaustion principles do not apply in ordinary mandamus proceedings (Code Civ. Proc., § 1085), but only in administrative mandamus proceedings (*id*., § 1094.5), the City is mistaken (see *Lopez v. Civil Service Com.* (1991) 232 Cal.App.3d 307, 314-315 ["The exhaustion doctrine applies generally whenever judicial relief is sought where a remedy is available at the administrative level.  It applies to *any* action for judicial relief, whether it be a writ or not, and long predates the 1945 enactment of section 1094.5"]).

The City invoked the meet and confer procedure, but did not raise the goods and services issue. Because the administrative process might have resolved or at least narrowed the dispute, such process was not optional if the City wanted to raise the issue in a judicial forum. The trial court correctly found the City failed to exhaust available administrative remedies by not raising the goods and services issue in the meet and confer forum. However, the trial court then ordered an inappropriate remedy for the City by remanding to the Department.

In *NBS Imaging Systems, Inc. v. State Bd. of Control* (1997) 60 Cal.App.4th 328, we held that a party's failure to raise an issue in an available administrative forum *precluded* the superior court from mandating that an agency act thereon. (*Id*. at pp. 335-337.) Although *NBS* was cited by the trial court, the trial court ordered the very relief we held was not appropriate in such cases, that is, remand to an agency to consider an issue a party did not raise before the agency when it had an opportunity to do so. We adhere to our reasoning in *NBS*, and reverse the part of the judgment ordering the Department to consider the goods and services claim.[6]

## II

### *The Dorsey Agreement*

The City contends postjudgment legislation changes the definition of an enforceable obligation in such a way as to encompass the Dorsey Agreement. That issue

---

[6] We decline to define the term "goods and services" as applicable to this case, as the parties ask us to do, because it is appropriate for the Department to consider the issue first, as it arises on specific facts lying within its bailiwick. Nor do we preclude the Department from considering whether it is too late to raise the issue. If it *is* too late, that would not change our analysis. (See *Roth v. City of Los Angeles* (1975) 53 Cal.App.3d 679, 687 ["The fact that the [administrative] remedy is no longer available does not, of course, alter application of the [exhaustion] doctrine, as to hold otherwise would obviously permit circumvention of the entire judicial policy behind the doctrine"].)

is properly within the Department's discretion to decide in the first instance, by way of its administrative review process.

Effective September 22, 2015, section 34171, subdivision (d)(2), which generally bars the enforceability of agreements between an RDA and its creator, was amended in relevant part to add: " Notwithstanding this paragraph, an agreement entered into by the [RDA] prior to June 28, 2011, is an enforceable obligation if the agreement relates to state highway infrastructure improvements to which the [RDA] committed funds pursuant to Section 33445." (Stats. 2015, ch. 325, § 2.)[7]  The Dorsey Agreement, facially relating to state highway improvements, was made within that statutory period.

The City asserts there is a generally applicable rule that an appellate court must apply the law in effect at the time of the appeal, and therefore we should hold that the Dorsey Project agreement is an enforceable obligation.

The Department does not claim the Dorsey Agreement falls outside this new definition, but instead argues (1) the new definition is not retrospective in operation, and (2) even if the new definition is retrospective, whether the Dorsey Agreement falls within that new definition is a matter that should be decided in the first instance via the Department's administrative review process.  We agree only with the Department's second point.

Although an appellate court normally reviews only matters presented to the trial court, "courts have not hesitated to consider postjudgment events when legislative changes have occurred subsequent to a judgment [citations] or when subsequent events have caused issues to become moot [citation]."  (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813.)  As for legal changes, this rule generally applies to injunctive

---

[7]  The relevant bill was a budget appropriations bill which took effect immediately upon gubernatorial signing.  (Stats. 2015, ch. 325, § 31; see *City of San Jose v. Sharma* (2016) 5 Cal.App.5th 123, 150 (*Sharma*).)

10

and declaratory relief cases, as in the two cases cited in the City's opening brief.  (See *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 837 [injunctive relief]; *City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 884-885 [declaratory relief] (*Watsonville*).)

> "The reason a reviewing court applies current rather than former law when reviewing an injunctive decree is because injunctive relief operates in the future. [Citations.]  It would be an idle gesture to affirm an injunctive decree because it was correct when rendered, 'with full knowledge that it is incorrect under existing law, and with full knowledge that, under existing law, the decree as rendered settles nothing so far as the future rights of these parties are concerned.' [Citation.]  It does not matter whether the Legislature intended the new law to be retroactive.  The reviewing court is interested in the law's prospective effect since that is when the decree under review will operate.

> "In our view, the same reasoning applies to a judicial declaration that has purely prospective effect.  A declaratory judgment is to ' "serve some practical end in quieting or stabilizing an uncertain or disputed jural relation." '  [Citation.] When resolution of the uncertainty at issue . . . operates only with respect to the future rights and duties of the parties, we apply the law in effect at the time of review because that is the law under which the judicial declaration will have effect."  (*Watsonville*, *supra*, 133 Cal.App.4th at pp. 884-885.)

The City presents no authority for the proposition that a new law should be applied by an appellate court when reviewing a trial court judgment in an administrative mandamus case, that is, a judgment following an administrative determination of a dispute falling within an agency's purview in the first instance.  Although the City's petition also sought declaratory relief and injunctive relief, those were couched as alternative remedies based on claimed failings by the Department in exercising its statutory duties.  But a case distinguishing *Watsonville* held it is not appropriate to apply a new law where the appellate court is considering the propriety of an action taken *at the time it was taken*, that is, before the law changed.  (*218 Properties, LLC v. City of Carson* (2014) 226 Cal.App.4th 182, 194, fn. 7.)  The thrust of the petition was that the Department violated the law then in effect, and that is what framed the issues decided by

11

the trial court. As we shall explain, we agree with the City that this particular statutory change was intended to apply retrospectively, but we agree with the Department that it should have the first opportunity to decide whether the Dorsey Agreement is enforceable in the first instance, as part of its administrative review process, exercising its expertise to the facts before it.[8]

The relevant statutory change was part of Senate Bill No. 107 in the 2015 regular session of the Legislature, a very lengthy bill that made many different kinds of changes to different parts of the dissolution statutes. (Stats. 2015, ch. 325.) In *Sharma*, *supra*, 5 Cal.App.5th 123, we held that one statutory change, regarding treatment of pension taxes collected before that statute's effective date, was *not* retrospective. (*Id*. at pp. 149-152; see § 34183, subd. (a)(1)(B).) We declined to address the impact of the new legislation "on tax increment associated with the retirement levy" *after* its effective date, and remanded that issue to the trial court to consider in the first instance. (*Sharma,* at p. 152.)

But *Sharma* did not hold all of Senate Bill No. 107 to be prospective. Cases are not authority for propositions not considered. (*Hart v. Burnett* (1860) 15 Cal. 530, 598.)

The Department relies on the general rule that "a statute overcomes the presumption of prospective-only effect only where there is express language to the contrary or if there are other indicia of legislative intent that provide a ' "clear and unavoidable implication" ' of retroactive intent." (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 50, 51.) Senate Bill No. 107 is "silent as to its application to the DDR, a process that was, by statute, to be completed over two years before" it was

---

[8] At first blush, this result may seem inconsistent with Part I, *ante*, where we find error in the trial court's decision to remand a determination for the Department's consideration rather than dismiss the claim. But in *this* situation, the City had no prior administrative remedy it *could* invoke prior to the passage of the new legislation, justifying the different outcomes. (See *County of Contra Costa v. State of California* (1986) 177 Cal.App.3d 62, 73 [describing exceptions to exhaustion requirement, including " 'when the administrative agency cannot grant an adequate remedy' "].)

12

enacted.  Therefore, "had the Legislature intended retroactive application of [the new] definition of 'enforceable obligation' to determinations" already made, "the Legislature would have expressed that intention with absolute clarity.  This did not happen, and the Court should conclude that no retroactivity was intended."

But as the City points out, the new definition applies to agreements entered into by RDAs *before June 28, 2011*, a date *prior to the enactment of Senate Bill No. 107*.  Senate Bill No. 107 took effect *after* RDAs had been stripped of their operating powers. Therefore, that new definition could not have *any* application if it were prospective.  It would be inapplicable to any relevant agreement and thus meaningless.  The City elaborates on this point with this pertinent observation:

> "Further evidence of legislative intent that this new language be retroactive is that it creates a new exception to the rule that most City-RDA agreements are not 'enforceable obligations' for application to the results of [DDR]s required by . . . section 34179.5.  Those reviews were all complete when the Legislature adopted Senate Bill [No.] 107 in 2015.  Moreover, the Department . . . has repeatedly contended that other provisions of . . . section 34171, subdivision (d)(2) operate retroactively to bar repayment of various City-RDA agreements. [Citations.]  In the face of an express legislative expansion of 'enforceable obligation,' the Department offers no plausible reading of the new language that can limit it to prospective operation."

The City's position accords with a general interpretive rule:  " ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose[]" [citation]; "a construction making some words surplusage is to be avoided." ' "  (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1111, quoting *Moyer v. Workmen's Comp. Appeals Bd*. (1973) 10 Cal.3d 222, 230 (*Moyer*); see *Emeryville*, *supra*, 233 Cal.App.4th at p. 304; see also Civ. Code, § 3541 ["An interpretation which gives effect is preferred to one which makes void"].)

Because the Department has not identified any application of the new language if it were held to be prospective, and applying the presumption against idle or surplus legislation, we agree with the City's view that the Legislature intended that this particular

13

section of Senate Bill No. 107 operate retrospectively. However, we decline to declare that the Dorsey Agreement is enforceable within the meaning of the new statutory definition, as the City asks us to do. We concur with the Department's alternative view, consistent with our holding in *Sharma*, that whether or not the new definition applies to a given agreement is not an issue that should be litigated in the first instance by an appellate court.

In *Sharma* we held the trial court was best suited to address the particular issue that remained to be decided in that case. (*Sharma*, *supra*, 5 Cal.App.4th at p. 152.) However, the issue to be decided in *this* case--whether the Dorsey Agreement is the kind of project contemplated by the new definition of Senate Bill No. 107--is one that properly would have gone first to the Department, had the new definition been in existence when the City invoked the meet and confer process. In our view, the Department is the appropriate body to consider the issue in the first instance. Accordingly, we shall direct the trial court to command the Department to consider in the first instance whether or not the Dorsey Agreement is an enforceable agreement under the new definition.[9]

### III

*The 1986 Agreement*

The City argues the 1986 agreement provided a separate basis on which to find the 2011 agreements at issue were enforceable obligations. It contends the trial court was wrong to treat the 1986 agreement between the City and its RDA as of only marginal

---

[9] The City insists the facts are undisputed and we should decide the issue to save the parties time and litigation expense. But if the facts are undisputed, that should make the administrative process simple. The City also posits futility, claiming the Department will insist the new highway project language is not retrospective. But we now hold otherwise, and we presume the Department will obey the law. (See Evid. Code, § 664; *Emeryville*, *supra*, 233 Cal.App.4th at pp. 302-303; *Bus Riders Union v. Los Angeles County Metropolitan Transportation Agency* (2009) 179 Cal.App.4th 101, 108 [presumption that public officials act in good faith].)

14

relevance, because it was entered into within two years of the City's creation of its RDA. Loan agreements entered into between RDAs and their creators within two years of creation may be enforceable. (§ 34171, subd. (d)(2) ["Notwithstanding this paragraph, loan agreements entered into between the [RDA] and the city . . . that created it, within two years of the date of creation . . . may be deemed to be enforceable obligations"].)

However, as described *ante*, the 1986 agreement was an umbrella agreement that set forth the mechanics of the operation of the RDA vis-à-vis the City. It permitted the City to "advance or expend" funds to the RDA or on its behalf, required periodic statements to the RDA of costs incurred by the City and required the RDA to use available funds to reimburse the City for all costs incurred. But the 1986 agreement did not reference any specific extant or anticipated projects, nor any "loan agreements" between the RDA and the City, as contemplated by section 34171, subdivision (d)(2).

The City contends: "A loan requires only [an] identified lender and borrower, an amount, a prepayment obligation, and repayment terms. [Citation.] A loan need not have a fixed amount or repayment schedule." But no amounts of any kind or contemplated loans whatsoever are described by the 1986 agreement. Indeed, the authority cited by the City cuts against its position: "Typically, a contract involving a loan must include the identity of the lender and borrower, the amount of the loan, and the terms for repayment in order to be sufficiently definite. [Citation.] Preliminary negotiations or agreements for future negotiations—so-called agreements to agree—are not enforceable contracts." (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1174.) Here, the 1986 agreement created a structure for how to treat future agreements, but was not a loan under any definition.

Therefore, we agree with the trial court that the 1986 agreement does not carry the force ascribed to it by the City. This does not mean the agreement was invalid at the time it was entered. It merely means the 1986 agreement is, at best, "marginally relevant" following the Great Dissolution, as the trial court properly found.

15

*Applicability of Postdissolution Statutes on Enforceable Obligations*

The City contends the Department erroneously applied the definition of an "enforceable obligation" provided by the dissolution statutes to the pre-dissolution agreements, in what amounted to an impermissible retrospective application of the various dissolution statutes to past conduct. We disagree.

The City contends that the DDR established by Assembly Bill No. 1484 "is essentially a supplemental audit"--an unobjectionable characterization as such--by which unobligated cash balances of RDAs could be identified, and any transfers other than for enforceable agreements could be recovered. (See § 34179.5; see also *Tracy*, *supra*, 3 Cal.App.5th at p. 859; *Brentwood*, *supra*, 237 Cal.App.4th at p. 495.) The City reasons that in conducting such audits, the Department may not apply the statutory definitions of enforceable obligations found in section 34171, subdivision (d), because "that subdivision defines 'enforceable obligation' for **post**-dissolution purposes and therefore does not apply to a [DDR] of pre-dissolution transfers."

We do not agree with the City's contention, the thrust of which we previously have rejected in other published cases, which we decline to revisit.

As we outlined *ante*, section 34171, subdivision (d)(2), as adopted by the original dissolution statute, provided (with exceptions) that agreements between a City and its RDA are not enforceable. (Added by Stats. 2011-2012, 1st Ex. Sess., ch. 5, § 7.) Assembly Bill No. 1484 did not change section 34171, subdivision (d)(2) in any way. But it did add section 34179.5, which in part provided for the DDR, and section 34179.6, which described the procedures following such review. (See Stats. 2012, ch. 26, §§ 17-18.)

Section 34179.5, subdivision (b)(2) provides in part: " 'Enforceable obligation' includes any of the items listed in subdivision (d) of Section 34171 [and] contracts detailing specific work to be performed that were entered into by the former [RDA] prior

to June 28, 2011, with a third party that is *other than the city* . . . that created the former [RDA.]" (Stats. 2012, ch. 26, § 17, italics added.) Thus, Assembly Bill No. 1484 preserved the rule contained in the original dissolution statute that (with exceptions) declared contracts between an RDA and its creator to be unenforceable for dissolution purposes.

As the Department contends "when it passed AB 1484, the Legislature intended to use section 34171, subdivision (d)'s definition of enforceable obligations to retroactively invalidate Creator/RDA agreements and claw back payments that were legal when made." We have agreed with this view in other cases, and still agree. (See, e.g., *Brentwood*, *supra*, 237 Cal.App.4th at pp. 500-502; *County of San Bernardino v. Cohen* (2015) 242 Cal.App.4th 803, 814-815 (*San Bernardino*).)

The City contends that sections 34167 and 34169, read in conjunction with the rest of the dissolution laws, work to limit section 34171's definition to cover only postdissolution contracts. We disagree. Section 34167, part of the original dissolution bill, provides that an enforceable obligation is "[a]ny legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy." (§ 34167, subd. (d)(5).) Similar language appears in the original version of section 34171, which defines several "enforceable" obligations, including, "Loans of moneys borrowed by the [RDA] for a lawful purpose, to the extent they are legally required to be repaid pursuant to a required repayment schedule or other mandatory loan terms" (*id.*, subd. (d)(1)(B)) and "Any legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy" (*id.*, subd. (d)(1)(E)). Section 34169, also part of the original dissolution bill, in part provided: "Until successor agencies are authorized . . . [RDAs] shall do all of the following: [¶] (a) Continue to make all scheduled payments for enforceable obligations, as defined in subdivision (d) of Section 34167."

17

These provisions must be harmonized with the rest of the dissolution statutes, if possible. (See *Moyer*, *supra*, 10 Cal.3d at p. 230 ["the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole"].) The natural way to do so is to view the category of agreements between RDA and their creators as the more specific category, and therefore generally not "enforceable" whether or not such agreements *also* fall within the broader definition of "enforceable" agreements provided by other parts of the dissolution statutes. We already have so held, or necessarily implied, in a number of published cases. (See *Tracy*, *supra*, 3 Cal.App.5th at pp. 860-861 [captioned "*The Legislature Intended Retroactively to Invalidate Transfers Pursuant to Sponsor Agreements*"]; *San Bernardino*, *supra*, 242 Cal.App.4th at p. 815 ["Construing the Dissolution Law and the cited statutes to mean that agreements between the County and the former [RDA] are enforceable obligations would negate the intent of the Legislature"]; *Brentwood*, *supra*, 237 Cal.App.4th at p. 500 [captioned "*The Legislature Intended to Abrogate Sponsor Agreements Retroactively*"].)

The original and still-extant version of section 34171 defines what is *not* an enforceable obligation, including, as we have said, "any agreements, contracts, or arrangements between the city, county, or city and county that created the [RDA] and the former [RDA.]" (*Id*., subd. (d)(2).)

The City asserts (citing sections 34167 and 34169) that before Assembly Bill No. 1484's DDR procedure existed, "RDAs had been statutorily mandated to pay their enforceable obligations — then defined to include City-RDA agreements." Its evident rationale is that those sections are in Part 1.8 of the Health and Safety Code (the freeze provision, effective June 28, 2011), whereas section 34171 is in Part 1.85, (the dissolution component, effective February 1, 2012). But as we outlined *ante*, the dissolution component became effective later because of a stay and subsequent judicial

18

reformation of statutory deadlines by our Supreme Court.  (See *Matosantos*, *supra*, 53 Cal.4th at pp. 250-251, 274-275.)

Like the trial court, we are not convinced by the City's view of the effect of this judicially created window period on the *Legislature's* intent.  The Legislature could not have foreseen that some portions of Assembly Bill No. 26 would be delayed by our Supreme Court.  To the extent any agreements between the City and its RDA may have been legally enforceable during this window period, their enforceability resulted from the vicissitudes of litigation, not legislative intent.  The enforceability of such agreements ended when that window was shut forcefully.  We are confident the Legislature intended to apply the postdissolution (i.e., Part 1.85) definitions of enforceable obligations retrospectively, for the reasons stated in our prior cases.  (See, e.g., *Tracy*, *supra*, 3 Cal.App.5th at p. 860.)

The City also invokes Proposition 22, contending applying the statutes retrospectively would violate it, and seeks to distinguish *Tracy* and *Brentwood* on this point or have us reconsider those decisions.  We will address the City's Proposition 22 claims in Part VI, *post*.

## V

### *The Validation Actions*

In a separate portion of its briefing, the City contends the clawbacks were barred by two validation actions.  We disagree with this view.

The City filed two validation actions resulting in default judgments declaring the 2011 agreements to be valid; those judgments were based on defaults taken *before* the Great Dissolution.  The trial court found the validation judgments had no effect on the analysis of whether either agreement was or was not an enforceable obligation.  We agree that these judgments are of no relevance herein.

19

"A validation action implements important policy considerations. '[A] central theme in the validating procedures is speedy determination of the validity of the public agency's action.' . . . The validating statutes should be construed so as to uphold their purpose, i.e., 'the acting agency's need to settle promptly all questions about the validity of its action.' [Citation.]

" '[I]n its most common and practical application, the validating proceeding is used to secure a judicial determination that proceedings by a local government entity, such as the issuance of municipal bonds and the resolution or ordinance authorizing the bonds, are valid, legal, and binding. Assurance as to the legality of the proceedings surrounding the issuance of municipal bonds is essential before underwriters will purchase bonds for resale to the public.' " (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842.)

Thus, a validation judgment answers the often important question whether a public action was lawful when that action was taken. A validation judgment is "forever binding and conclusive, *as to all matters therein adjudicated or which at that time could have been adjudicated*." (Code Civ. Proc., § 870, subd. (a), italics added.)

But the Department does not attack the lawfulness of the agreements in question *as of the time they were entered*. Instead, the Department is applying the later-enacted dissolution statutes, which were designed to unwind them. The validity of the Department's actions could not have been adjudicated in the validation cases, which preceded the Great Dissolution. (See, e.g., *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164, 178, 179 ["the repayment contract and project lease entered into ostensibly 'pursuant to' the financing agreement contain terms so new and materially different from the agreement, that the issue of the City's violation of the constitutional debt limitation could not possibly have been adjudicated" in prior validation action]; cf. *Colonies Partners, L.P. v. Superior Court* (2015) 239 Cal.App.4th 689, 692, 693-695 [whether settlement confirmed by validation judgment was procured by bribery could have been litigated in the validation action, in part distinguishing *Starr*].)

The City points to *Macy v. City of Fontana* (2016) 244 Cal.App.4th 1421 (*Fontana*), which addressed the validation statutes in an unusual context touching on the dissolution of RDAs.[10] *Fontana* is distinguishable. Challengers were trying to force Fontana to pay into a low- and moderate-income housing fund an amount that allegedly *should have been paid* by Fontana's dissolved RDA under provisions of the repealed CRL. (*Id.* at p. 1425.) Fontana's successful demurrer was upheld because "under Assembly Bill 26, the liabilities of dissolved [RDAs] are limited to the assets transferred to successor agencies." (*Ibid.*) Although Fontana had entered into an agreement with the RDA and a developer that distributed some tax increment revenue, that agreement had been the subject of a validation action which *Fontana* held "foreclosed any claims against [Fontana] with respect to tax increment funds it received under the agreement." (*Id.* at p. 1426.) The agreement purported to give some money to Fontana as "compensation to [Fontana] for fiscal costs [Fontana] incurred as a result of [a private] development within [Fontana]. Importantly, the [RDA] and [Fontana] brought a validation action" regarding that agreement, resulting in a final judgment validating the agreement. (*Id.* at p. 1427.) In the key portion of the opinion, *Fontana* held:

> "Here, the central premise of [Fontana]'s participation in the [agreement] is the agreement's affirmation that the [RDA] was meeting its obligations under the CRL and that it was lawful to distribute the [RDA's] tax increment funds to [the developer] and [Fontana]. The central premise of plaintiffs' claims is . . . their assertion that the [RDA] was not meeting its obligations under the CRL and that its distributions to [the developer] and [Fontana] were not lawful. By obtaining the validation judgment, [Fontana] protected itself, as well as the [RDA] and [developer], from precisely the claims that plaintiffs now assert arise under and by virtue of the agreement." (*Fontana*, *supra*, 244 Cal.App.4th at pp. 1433-1434.)

---

[10] *Fontana* was not decided by this court; it arose on facts that did not require the case to be filed in Sacramento County under section 34168, subdivision (a).

The reason *Fontana* is distinguishable is that the issues pressed by the challengers in that case were live issues when the validation action in that case had been filed, whereas the issues herein, the applicability of mechanisms designed to unwind RDAs to specific agreements, could not have been presented in the relevant validation actions. As the Department points out, it is not challenging the *validity* of any agreements. (Cf. *Fontana*, *supra*, 244 Cal.App.4th at p. 1435 ["the propriety of that past action"].) Rather, it is determining whether or not the agreements are "enforceable obligations" under the present dissolution statutes, an entirely different question. Contrary to the City's view, "valid" for one purpose need not equate to "enforceable" for an entirely different purpose, unknown at the time the validation actions were filed. (See, e.g., *City of Galt v. Cohen* (2017) 12 Cal.App.5th 367, 380-383 (*Galt*) [rejecting a somewhat analogous claim about the effect of validation judgments, vel non, on the application of the dissolution statutes].)

Thus, we agree with the trial court that the two validation judgments are not relevant to the issues presented by this case.

## VI

### *Proposition 22*

The City contends application of the Great Dissolution in the manner the Department interprets it violates Proposition 22.

Proposition 22, the Local Taxpayer, Public Safety, and Transportation Protection Act of 2010, in part amended article XIII, section 25.5 of our Constitution to restrain the Legislature's ability to "[r]equire [an RDA] (A) to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property allocated to the agency pursuant to Section 16 of Article XVI to or for the benefit of the State." (Cal. Const., art. XIII, § 25.5, subd. (a)(7).) Our Supreme Court held this provision of Proposition 22 did not preclude the dissolution of RDAs. (*Matosantos*,

22

*supra*, 53 Cal.4th at pp. 241-242, 260-264; see *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1484.)

We have repeatedly rejected claims that the application of the dissolution statutes violates Proposition 22. (See *Cuenca*, *supra*, 8 Cal.App.5th at pp. 233-234; *Tracy*, *supra*, 3 Cal.App.5th at pp. 861-863; *San Bernardino*, *supra*, 242 Cal.App.4th at pp. 810-814; *Brentwood, supra,* 237 Cal.App.4th at pp. 496-500.) Indeed, in *City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020, we stated: "The Supreme Court has already found that Assembly Bill [26] did not violate either article XVI, section 16 *or Proposition 22*, which added article XIII, section 25.5, subdivision (a)(7). (See *Matosantos I*, *supra*, 53 Cal.4th at pp. 241-242.) We are bound by the high court's ruling." (*Id*. at p. 1038, fn. 2, italics added.) Our Supreme Court summarized its view in part by stating: "Proposition 22, while it amended the state Constitution to impose new limits on the Legislature's fiscal powers, neither explicitly nor implicitly rescinded the Legislature's power to dissolve redevelopment agencies." (*Matosantos*, *supra*, 53 Cal.4th at p. 242.)[11]

The City relies in part on *City of Bellflower v. Cohen* (2016) 245 Cal.App.4th 438 (*Bellflower*), but *Bellflower* is distinguishable. In that case we held one kind of action taken under the dissolution laws violated a *different* provision of Proposition 22 that reads: "The Legislature may not reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government's purposes." (Cal. Const., art. XIII, § 24, subd. (b); see *Bellflower*, *supra*, 245 Cal.App.4th at pp. 444-445 ["We refer to this provision as 'Proposition 22,' even though we recognize that there are other provisions in Proposition

_____

[11] In contrast, Proposition 22 had a profound effect on a companion bill that would have allowed RDAs to buy themselves out of dissolution. (See *Matosantos*, *supra*, 53 Cal.4th at pp. 242, 264-270.) That invalidated bill is of no relevance to this case.

23

22 that are not applicable to this case"].)  The City contends *Bellflower* is relevant--even critical--to this case.  We disagree.

*Bellflower* involved a narrow *collection* issue, explained as follows:

"Under the redevelopment dissolution law, the Legislature directed that a dissolved redevelopment agency's funds not needed to meet enforceable obligations must be turned over to the county's auditor-controller for distribution to local taxing entities. After the California Supreme Court found that dissolving the redevelopment agencies was an appropriate exercise of the Legislature's constitutional power, the Legislature enacted Assembly Bill No. 1484 (2011-2012 Reg. Sess.) providing what to do if the successor agency or sponsoring agency of the former redevelopment agency did not turn over those funds to the county's auditor-controller.  One method of enforcing the turnover is for the Board of Equalization to withhold sales and use tax revenues to which the sponsoring agency is entitled, and another is for the county auditor-controller to withhold property tax revenues to which the sponsoring agency is entitled.

"These two cases . . . present a facial constitutional challenge: whether the statute allowing withholding of sales and use tax revenues and property tax revenues violates Proposition 22, which amended the California Constitution in 2010 to prohibit the state from reallocating, transferring, or otherwise using revenues from taxes imposed or levied by a local government solely for the local government's purposes.  (Cal. Const., art. XIII, § 24, subd. (b).)  We conclude that the statute is unconstitutional to the extent it allows the state to reallocate, transfer, or otherwise use tax revenue belonging to the local government."  (*Bellflower*, *supra*, 245 Cal.App.4th at pp. 442-443.)

We adhere to our conclusion in *Bellflower*, for the reasons stated therein.  However, the City states that the clawback order in this case required "the City to refund $1.2 million to the Nevada County Auditor-Controller," which is not the same as the withholding of sales, use, or property taxes, as in *Bellflower*.  The City reads *Bellflower* as erecting a bulwark against *any* diversions of money, arguing it bolsters its various prospectivity arguments and undermines the Department's actions herein because it precludes any "scheme" that "diverts tax increment revenues once allocated to an RDA."

As the Department contends, this broad view unmoors *Bellflower* from its narrow holding.  As the City points out in its reply brief, "*Bellflower* . . . [concluded] Proposition

24

22 prohibits seizing a city's sales, use, or property tax revenues in payment of an alleged successor agency debts."  We agree.  (See *Bellflower*, *supra*, 245 Cal.App.4th at pp. 450-451.)  But *Bellflower* did not discuss the propriety of the Department's determination of any enforceable obligation.  Instead, *Bellflower* emphasized that it "consider[ed] only whether *withholding local tax revenue from the sponsoring agency* under section 34179.6(h) violates Proposition 22."  (*Id.* at p. 450, italics added.)  We explained that the challengers in that case "make no argument with respect to other means the State may use to implement and enforce the dissolution law."  (*Ibid.*)  "Holding that Proposition 22 prohibits the reallocation, transfer, or other use of local tax revenue . . . does not frustrate the manifest purpose of Proposition 22."  (*Id.* at p. 452.)  "For example, the State is authorized to obtain judicial relief for violation of the dissolution law."  (*Id.* at p. 453, citing § 34177, subd. (a)(2).)  But, "[w]ithholding local tax revenue simply is not a remedy available to the State . . . because the voters precluded that remedy when they passed Proposition 22."  (*Id.* at p. 454.)

In short, *Bellflower* is far narrower than the City suggests.  As we explained in *Tracy*:  "The import of *Bellflower* is that the Legislature cannot withhold local tax revenues from sponsors through administrative fiat as a remedy for violation of the directives in the Great Dissolution.  However, the sponsors are not rendered judgment-proof by virtue of the constitutional provision, such that their general funds are immune from answering for a violation of state law in court."  (*Tracy*, *supra*, 3 Cal.App.5th at p. 862.)  Accordingly, we reject the City's view that Proposition 22 advances its arguments as they pertain to the circumstances of this case.

## VII

### *Impairment of Contracts*

Raising another claim we have repeatedly rejected, the City contends application of the dissolution statutes to the agreements in question improperly impairs its contractual rights.  We adhere to our view to the contrary.

25

Under federal law, "No State shall . . . make any . . . Law impairing the Obligation of Contracts. . . ." (U.S. Const. art I, § 10, cl. 1.) And our Constitution provides that a "law impairing the obligation of contracts may not be passed." (Cal. Const., art I, § 9.)

But California is free to modify or abolish its subdivisions. (See *Azusa*, *supra*, 238 Cal.App.4th at pp. 630-631; *Emeryville*, *supra*, 233 Cal.App.4th at p. 312.) The City has no right to complain that the state is impairing its contractual rights. (See *Mallon v. City of Long Beach* (1955) 44 Cal.2d 199, 209 (*Mallon*) ["the state acting through the Legislature has the power to alter contractual or property rights acquired by the municipal corporation from the state for governmental purposes"]; *Sharma*, *supra*, 5 Cal.App.5th at p. 148 ["subordinate political entities are ' "creatures" ' of the state and have no standing to challenge state action on due process or impairment of contracts grounds"; citing *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6 (*Star-Kist*)].)

This is implicit in *Matosantos*: "[I]f a political entity has been created by the Legislature, it can be dissolved by the Legislature, barring some specific constitutional obstacle to a particular exercise of the legislative power. 'In our federal system the states are sovereign but cities and counties are not; in California as elsewhere they are mere creatures of the state and exist only at the state's sufferance.' " (*Matosantos*, *supra*, 53 Cal.4th at p. 255.) Although our Supreme Court opined that abruptly dissolving RDAs with no plan to wind down their obligations *to other entities* "would inevitably raise serious impairment of contract questions," (*Id*. at p. 263), a detailed wind-down mechanism was established by the Legislature, as we have described. Further, the City does not have the right to raise the purported contractual rights of other entities. "As Hamlet pondered, 'What's *Hecuba* to him, or he to *Hecuba*/That he should weep for her?' " (*Brentwood*, *supra*, 237 Cal.App.4th at pp. 503-504; see *Azusa*, *supra*, 238 Cal.App.4th at pp. 630-631; see also *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 242.) Nor does it appear the City means to do so in this case.

26

The City contends a local government can challenge state action that conflicts with federal law under the supremacy clause (U.S. Const., art. VI, cl. 2), citing *San Diego Unified Port Dist. v. Gianturco* (S.D. Cal. 1978) 457 F.Supp. 283 and *Star-Kist*, *supra*, 42 Cal.3d 1.  These authorities stand for the unremarkable proposition that "[c]ourts have recognized that, consistent with our federal system of government, state political subdivisions should be given standing to invoke the supremacy clause to challenge a state law *on preemption grounds*."  (*City of Garden Grove v. Superior Court* (2007) 157 Cal.App.4th 355, 371, italics added.)  *Star-Kist* explained that the general rule was a political subdivision could *not* challenge the actions of its creator.  (*Star-Kist*, *supra*, 42 Cal.3d at pp. 5-6.)  It held that "legislative control over cities and counties is reflected in the well-established rule that subordinate political entities, as 'creatures' of the state, may not challenge state action as violating the entities' rights under the due process or equal protection clauses of the Fourteenth Amendment *or under the contract clause of the federal Constitution. . . .* This rule's application beyond Fourteenth Amendment and contract clause challenges remains unsettled."  (*Id.* at p. 6, italics added.)  *Star-Kist* took a narrow view of any exceptions to this rule, in part holding:  "[T]he *Gianturco* court noted that a distinction between the supremacy clause and other constitutional provisions lies in the purpose served by each.  Provisions like the Fourteenth Amendment *and the contract clause* 'confer fundamental rights on individual citizens'; the supremacy clause, in contrast, 'establishes a structure of government which defines the relative powers of states and the federal government.'  [Citation.]  *Political subdivisions cannot assert 'constitutional rights which are intended to limit governmental action [vis-à-vis] individual citizens'* but may invoke the supremacy clause to challenge preempted state law.  [Citation.]  Otherwise 'such legislation and regulation often would go unchecked even though expressly prohibited by the Constitution.' "  (*Id.* at p. 8, italics added.)  While *Star-Kist* concluded a commerce clause challenge, too, was exceptional (*id.* at pp. 8-10), it did not retreat from the holding that a contract claim was not, and could not be

27

launched by a political subdivision against its creator. (See *Galt*, *supra*, 12 Cal.App.5th at pp. 378-379.)

In part the City contends that its contract claims must be considered, or else it will lack the means to enforce Proposition 22. We have already concluded that Proposition 22 avails the City naught in this case (see Part VI, *ante*).[12]

---

[12] We reject the City's view that we were incorrect or speaking in dicta when we stated in *Azusa*: "The City contends the Department's actions result in unlawful takings. The Department's actions took money from the RDA, a government entity. No private interests are harmed by such action. As we recently emphasized: 'The Legislature is free, within the confines of the California Constitution, to reconfigure and redistribute authority to its subdivisions as it chooses.' (*Emeryville*, *supra*, 233 Cal.App.4th at p. 312; see [*Star-Kist*, *supra*, 42 Cal.3d at p. 6]; [*Mallon, supra,* 44 Cal.2d at p. 209].) This includes the power to reallocate public money, again, *within the confines of the limitations in the California Constitution*. But no *taking* of private property—money or an uncollected debt—has occurred in this case, where one political subdivision disgorges assets to another political subdivision." (*Azusa*, *supra*, 238 Cal.App.4th at p. 630, first italics added.) The italicized portion of this passage reflects our recognition that the Legislature's power may be trumped by specific provisions in our constitution, such as the provision discussed in *Bellflower*, *supra*, 245 Cal.App.4th 442.

## DISPOSITION

The judgment is reversed with directions to the trial court to recall the writ commanding the Department to consider the City's goods and services claim, and to issue a new writ commanding the Department to consider the City's highway project claim, consistent with this opinion. The judgment is otherwise affirmed. The parties shall bear their own costs on appeal.[13] (See Cal. Rules of Court, rule 8.278 (a)(3).)


                                                               /s/
                                                    Duarte, J.

We concur:


_____/s/_____
Hull, Acting P. J.


_____/s/_____
Mauro, J.

---

[13] We deny all pending requests for judicial notice "because the proffered material is unnecessary to our decision." (*Emeryville*, *supra*, 233 Cal.App.4th at p. 312, fn. 13.)