Filed 10/12/16  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

**(Sacramento)**

----

| | |
|---|---|
| CITY OF TRACY, as Successor Agency, etc., et al., | C077440 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2013-80001570-CU-WM-GDS) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| MICHAEL COHEN, as Director, etc., et al., | |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on September 29, 2016, for publication in the Official Reports, be modified as follows:

1.    Delete the modifier year "2011" from the following pages of the slip opinion:

Page 2, last line of body text, "to any ~~2011~~ sponsor agreements that"

Page 3, third line of first partial paragraph, "to a ~~2011~~ sponsor agreement;"

Page 3, first full paragraph, fifth line, "pursuant to a ~~2011~~ sponsor agreement,"

Page 3, last line of body text, "any predissolution ~~2011~~ sponsor agreements."

Page 4, first line of first partial paragraph, "of ~~2011~~ sponsor agreements"

Page 8, second line of the part 1.0 heading, "**~~2011~~ Sponsor Agreements**"

Page 8, third line from bottom of the page, "include ~~2011~~ sponsor agreements predating dissolution."

Page 9, second line of the part 2.0 heading, "**Pursuant to ~~2011~~ Sponsor Agreements**"

Page 9, penultimate line on the page, "under ~~2011~~ sponsor agreements"

2.      On page 7, last line, insert the word "predissolution" before the phrase "sponsor agreements" and delete the last three words on the last line "executed in 2011," so that the last sentence on the page (which continues over to p. 8) will read:

> As noted at the outset, for the purposes of this audit, the Legislature applied the postdissolution definition of enforceable obligations that specifically excluded transfers pursuant to predissolution sponsor agreements which previously had been considered enforceable under section 34167.

3.      On page 9, first full paragraph, penultimate sentence of the paragraph, delete the word "these" and replace with the word "new" and add the phrase ", as well as any payments pursuant to sponsor agreements antedating 2011." to the end of the sentence, so that the penultimate sentence of the paragraph will read as follows:

> In short, the Legislature *intended* to layer upon the existing statutory dissolution framework a *new* procedure and definition to recapture diverted tax increment that the sponsors and former redevelopment agencies siphoned away through new sponsor agreements beginning in January 2011 in response to the imminence of ERAWKI before the judicially delayed dissolution date of February 2012, as detailed in the February 2012 report of the Legislative

2

Analyst (*Brentwood*, at p. 499, fns. 13 & 14), as well as any payments pursuant to sponsor agreements antedating 2011.

4.    Page 12, last complete sentence on the page, add a new footnote (fn. 9) at the end of the sentence as follows:

However, the City is correct that it was entitled to be paid for the redevelopment work that its *own* staff directly provided; this was not the case in *Brentwood*, a distinction that the Department overlooks. [9]

_____

[9] In a petition for rehearing, the Department argues that a sponsor's provision of services for redevelopment projects must be pursuant to a written services agreement authorizing them, lest the sponsor unilaterally obligate the former redevelopment agency. While reimbursement agreements such as the one at bar cannot sanction payments for third party services, they are sufficient authorization for a sponsor to provide services in furtherance of the redevelopment projects identified in the agreement.

There is no change in the judgment.  Respondents' petition for rehearing is denied.

BY THE COURT:


_____HULL_____, Acting P. J.


_____ROBIE_____, J.


_____BUTZ_____, J.

3

Filed 9/29/16  (unmodified version)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**THIRD APPELLATE DISTRICT**

**(Sacramento)**

**----**

| | |
|---|---|
| CITY OF TRACY, as Successor Agency, etc., et al., | C077440 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2013-80001570-CU-WM-GDS) |
| v. | |
| MICHAEL COHEN, as Director, etc., et al., | |
| Defendants and Respondents.[1] | |

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W.L. Chang, Judge.  Affirmed as modified.

City of Tracy, as successor agency, and City of Tracy, Bill Sarton, City Attorney; Goldfarb & Lipman, Dolores Bastian Dalton, James T. Diamond, Jr., and Karen M. Tiedemann, for Plaintiffs and Appellants.

---

[1] We again adjust the appellate title in one of these appeals, putting the official capacity cart ("Successor Agency, etc.") back behind the party name horse ("City of Tracy"), and deleting the Department of Finance as a party, a redundant defendant.  (*City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 492, fn. 3 (*Brentwood*)).

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Marc A. LeForestier and John W. Killeen, Deputy Attorneys General, for Defendants and Respondents.

In 2011, the political branches of our state government decided as a matter of public policy that abuses of the redevelopment law, which constituted an ever-growing drain on state finances, required the dissolution of nearly 400 redevelopment agencies and the winding down of outstanding redevelopment obligations; this resulted in a frantic scurry on the part of "sponsoring entities"[2] (usually cities) and their conjoined former redevelopment agencies to lock up "tax increment" revenues—the share of property taxes to which redevelopment agencies had been entitled before the enactment of this " 'Great Dissolution.' " (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 243-248; *Brentwood*, *supra*, 237 Cal.App.4th at pp. 491, 492, fn. 4, 499 & fns. 13, 14.) It has also resulted in scores of actions in the Sacramento County Superior Court (§ 34168, subd. (a)) that primarily involve the sponsoring entities and their equally conjoined "successor agencies"[3] seeking to evade this legislative determination.

We confront a recurring issue in this appeal. In 2012, the Legislature decided to apply the *postdissolution* exclusion of any agreements between a sponsor and a former redevelopment agency (hereafter, sponsor agreements) from the definition of "enforceable obligations" (see fn. 3, *ante*, at p. 2) to any 2011 sponsor agreements that

---

[2] " 'Sponsoring entit[ies]' " are the local entities that created the former redevelopment agencies, the officials of the local entities usually constituting the redevelopment agency boards. (Health & Saf. Code, § 34171, subd. (n); undesignated statutory references are to the Health and Safety Code).

[3] " 'Successor agenc[ies]' " are essentially caretakers, the boards of which usually are also the officials of the former sponsoring entities, empowered only to complete ongoing " '[e]nforceable obligations' " (those which are still entitled to tax increment) of the former redevelopment agency. (§ 34171, subds. (j), (d); *Brentwood*, *supra*, 237 Cal.App.4th at p. 491, fn. 2.)

*antedated* dissolution (which previously had still been included in the definition), for the purpose of retransferring to "taxing entities"[4] any redevelopment agency transfers to sponsors pursuant to a 2011 sponsor agreement; the Legislature also created an audit process to identify these sponsor transfers. (*Brentwood*, *supra*, 237 Cal.App.4th at p. 494; §§ 34167, 34171, subd. (d)(2), 34179.5, 34179.6.)

The City of Tracy (City) brought this action as the successor agency to its former redevelopment agency (and also in its own right) against Michael Cohen as director of the Department of Finance (the Department) to challenge administrative determinations that invalidated the transfer of funds from the former redevelopment agency—before its dissolution—to the City because this action was pursuant to a 2011 sponsor agreement, and that directed return of a portion of the funds (constituting bond proceeds) to the successor agency and another portion (constituting former tax increment) to the Auditor-Controller of San Joaquin County (Auditor-Controller),[5] the administrator of the trust fund for former tax increment (§ 34182, subd. (c)), to distribute to the taxing entities. (*Brentwood*, *supra*, 237 Cal.App.4th at p. 492 & fn. 3.) The trial court granted judgment in favor of defendants.

Without any analysis of *Brentwood*, which antedates its briefing, the City makes a lengthy argument in its opening brief (to which it does not return in its reply brief) that, as a matter of statutory analysis, the 2012 audit procedure and its incorporation of the postdissolution definition of enforceable obligations was not intended to apply to any predissolution 2011 sponsor agreements. It also contends there are constitutional

---

[4] " 'Taxing entities' " are the entities now entitled to tax increment after the abolition of redevelopment agencies. (§ 34171, subd. (k); *Brentwood*, *supra*, 237 Cal.App.4th at p. 492.)

[5] The Auditor-Controller is the nominal other defendant. Although he filed an answer contesting the petition, neither party points to any further participation on his part in the litigation in the trial court and he has not filed a brief on appeal.

obstacles to retroactive exclusion of 2011 sponsor agreements from the definition of enforceable obligations.[6]  Alternately, it argues that the transfers it received come within the "goods or services" exception to the exclusion of sponsor agreements.  (§ 34179.5, subd. (b)(3).)[7]  Finally, the City contends that it was entitled to a declaration that the Department may not constitutionally avail itself of an administrative remedy that allows the Department to order diversion of future local tax revenues (sales, use, and property) to recover wrongfully transferred tax increment from a sponsoring entity.  (§§ 34179.6, subd. (h), 34179.8, subd. (a).)

We agree that *a portion* of the payments made to the City reflect goods or services that the City provided to the redevelopment project that the successor agency was overseeing.  Our decision in *City of Bellflower v. Cohen* (2016) 245 Cal.App.4th 438, remittitur issued May 3, 2016 (*Bellflower*), renders moot any need for a declaration in the present action that the administrative diversion of future local tax revenues violates a

---

[6]  In this context, the City mentions a violation of due process in a *heading*, and adverts in passing to interference with a vested interest in the body of its analysis, but does not develop either argument.  This forfeits any further consideration of these suggestions (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593 (*Imagistics*)), which are also unavailing in any event.  (*Brentwood*, *supra*, 237 Cal.App.4th at p. 498, fn. 12; see *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6.)

[7]  Improperly admixed under the due process heading is an unrelated lurking argument that the trial court improperly ordered return of the bond proceeds because these may now properly be expended on the redevelopment expenses for which the bonds were sold. (§ 34191.4.)  This manner of raising the issue forfeits our plenary consideration. (*Imagistics*, *supra*, 150 Cal.App.4th at p. 593, fn. 10.)  We simply observe that, while it does seem pointless to order the return of bond proceeds that the successor agency can then expend on the same project, it is also difficult to find ultimate prejudice to the City, thus requiring modification of the judgment.

provision of our state charter (Cal. Const., art. XIII, § 24, subd. (b)).[8] We otherwise reject the City's claims and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

As is typically the case with the statutory interpretation involved in these redevelopment agency dissolution cases, the particular facts are largely irrelevant. We include them primarily for context.

The City created its former redevelopment agency in 1970, designating its city council as the administrating body. The former redevelopment agency adopted a community redevelopment plan in 1990 for the project area. In 2008, the former redevelopment agency developed a five-year implementation plan, which included the development of a downtown shopping plaza. To this end, the City and its former redevelopment agency issued bonds in 2008, from which the former redevelopment agency received $2.13 million in proceeds (rounded to the nearest ten thousand, as will be all dollar figures in this opinion). However, the former redevelopment agency did not enter into any contractual obligation to carry out the planned downtown improvements before 2011.

In January 2011, the Governor announced his intention to seek the abolition of redevelopment agencies, leading to the resultant frenzy on the part of former redevelopment agencies and their sponsoring agencies throughout the state to lock up unencumbered tax increment. (*Brentwood*, *supra*, 237 Cal.App.4th at pp. 493, 499.) The City and its former redevelopment agency were among these. At a January 2011 special meeting of the city council in its joint capacities, the City and its former redevelopment agency entered into a "cooperation agreement" for the former redevelopment agency to fund identified improvements from the five-year plan, for which the City would acquire

_____

[8] Further references to articles are to the California Constitution.

5

land and provide design and construction services. The sources of the revenue were all "funds currently held by the [redevelopment agency] . . . not previously budgeted or appropriated for other . . . projects . . . ." The agreement specified four projects: the downtown shopping plaza, downtown infrastructure, acquisition of properties for joint public-private improvements, and a signage program. In response to an inquiry whether there was any binding commitment to these four projects, the City's finance director stated at the meeting that the agreement "does not mean the projects are being funded. The plan is simply moving forward." The agreement "will allow the City Council to proceed and to award contracts for these projects." The purpose of entering into the cooperation agreement was to "directly address some of the issues presented by the Governor's proposed budget"; rather than return redevelopment agency reserves to the "state" (actually, to the taxing entities), "the action . . . transfers the funds to the City." The City and the redevelopment agency thus enacted resolutions approving the agreement. The redevelopment agency on the same date transferred $4.18 million in tax increment funds and $2.13 million in bond funds to the City pursuant to the agreement.

In declaring that it was not subject to the California Environmental Quality Act, the cooperation agreement recited that it was a funding mechanism that did not commit any funds to any specific public improvement. The agreement provided that the funds the City received from the redevelopment agency could be used to pay for "land acquisition, relocation, demolition, site preparation and remediation, design, and construction" of the listed projects, and reimbursement of the City's "staff, consultant and other administrative costs in connection therewith." The City and the redevelopment agency retained the power to modify the plan to add or delete projects.

The City estimates the construction costs for the plaza project on its February 2014 completion to have been $3.81 million. The City had entered into contracts in May 2011 with third parties to provide landscaping and engineering services for the plaza for a

6

total cost of $141,000. The City incurred an additional $911,000 in "design, construction management, staff and inspections costs" for the work of City employees in connection with the plaza project. In June 2011, the City entered into a $2.30 million contract with Knife River Construction to build the shopping plaza. An additional $460,000 in funds were attributed to a 20 percent contingency fee. The City also entered into a contract in June 2011 with a third party to buy land near the plaza for $650,000. This brought the total amount of expenditures at issue to $4.46 million, which reflected the $2.13 million in bond proceeds and $2.34 million in tax increment from the former redevelopment agency (our rounding of the components resulting in a larger sum than the total).

On June 28, 2011, the Legislature enacted the Great Dissolution as an urgency measure, immediately freezing the authority of the former redevelopment agencies to incur further obligations and providing a process for the dissolution of the former redevelopment agencies on February 1, 2012 (as judicially reformed). (*Brentwood*, *supra*, 237 Cal.App.4th at p. 494.) After that date, the successor agencies were responsible for winding down the outstanding enforceable obligations of the former redevelopment agencies, which did not include "sponsor agreements" between the former redevelopment agency and its sponsoring agency. (*Ibid*.; §§ 34171, subd. (d)(2), 34177, subd. (a).) Pursuant to section 34179.5, enacted in 2012, a successor agency had to undertake audits of the former redevelopment agency's accounts, subject to the Department's review. Upon the Department's determination that transferred funds were not the subject of any enforceable obligation, a successor agency had the obligation to transmit such funds in its possession to the county's auditor-controller for distribution to taxing entities and make a diligent effort to recover funds already transferred to the sponsor agency. (*Brentwood*, at p. 495.) As noted at the outset, for the purposes of this audit, the Legislature applied the postdissolution definition of enforceable obligations that specifically excluded transfers pursuant to sponsor agreements executed in 2011,

7

which previously had been considered enforceable under section 34167. Section 34179.6, as noted, provided an administrative remedy in the form of diverting future local tax revenues to recoup funds wrongfully transferred to a sponsor agency.

In reviewing the result of such an audit, the Department concluded the cooperation agreement was an invalid sponsor agreement, and consequently the $6.31 million transfer was not an enforceable obligation. The City returned $1.84 million to the successor agency under protest. The Department directed that the remaining bond proceeds be returned to the successor agency, and the tax increment to the Auditor-Controller.

The City then brought the instant action in July 2013. The Department thereafter issued a demand that the City comply with its administrative findings, or else it would direct the diversion of the City's future local tax revenues to reclaim the $4.46 million. However, it never took action to direct the diversions. Under protest, noting that it had already expended all the funds at issue on the redevelopment project, the City remitted the contested amounts from its general fund in December 2015 in order to meet an impending deadline for obtaining a "finding of completion" (§ 34179.7).

**DISCUSSION**

**1.0 The Legislature Intended Retroactively to Invalidate Transfers Pursuant to 2011 Sponsor Agreements**

In interpreting the Great Dissolution legislation, we do not owe any deference to the Department; we decide the issue de novo. (*Brentwood*, *supra*, 237 Cal.App.4th at p. 500.)

The City contends the incorporation in section 34179.5 of the postdissolution definition of enforceable obligation for the audit and retransfer process should not be interpreted as intending to include 2011 sponsor agreements predating dissolution. To this end, it gives a strained reading of section 34179.5, and concocts "conflicts" with sections 33445 (the statute previously authorizing sponsor agreements), 34164 (which

8

froze any new predissolution redevelopment activities), 34167.5 (which allowed *asset* transfers to *third parties* pursuant to enforceable contracts), 34177 (a provision of which directs distribution of *unencumbered* funds designated for subsidized housing to auditor-controllers), and 34167 itself (the predissolution definition of enforceable obligations), without explaining why the Legislature could not conclude "in retrospect [that] the facts on the ground demonstrated . . . the need to have abrogated the authority to enter into sponsor agreements from the moment that ERAWKI [end of redevelopment as we knew it] was foretold . . . ." (*Brentwood*, *supra*, 237 Cal.App.4th at p. 499.)

In *Brentwood*, we rejected this tactic of hunting indirectly through legislative mouseholes for an elephant of legislative intent. "[I]f this were in fact the intent in enacting section 34179.5[,] it would have been so much more straightforward simply to define 'enforceable obligation' by reference to section 34167 rather than section 34171." (*Brentwood*, *supra*, 237 Cal.App.4th at p. 501.) In short, the Legislature *intended* to layer upon the existing statutory dissolution framework a *new* procedure and definition to recapture diverted tax increment that the sponsors and former redevelopment agencies siphoned away through these sponsor agreements beginning in January 2011 in response to the imminence of ERAWKI before the judicially delayed dissolution date of February 2012, as detailed in the February 2012 report of the Legislative Analyst (*Brentwood*, at p. 499, fns. 13 & 14). We accordingly reject without further elaboration the City's arguments to the contrary.

**2.0     The Legislature Did Not Violate the Constitution in Retroactively Invalidating Transfers Pursuant to 2011 Sponsor Agreements**

2.1     *Section 34179.5 Does Not Result in a Gift of Public Funds*

The City argues that the redirection of funds transferred under 2011 sponsor agreements is a gift of public funds in violation of article XVI, section 6. The claim,

which is not renewed in its reply brief, ignores this court's decision in *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457 (*CRA v. Matosantos*).)

We rejected this claim in *CRA v. Matosantos*. Relying on authority that a redirection of local tax revenues (derived only for general purposes from residents of the county) from specific local agencies to the county's general fund is not a gift of public funds (*CRA v. Matosantos*, *supra*, 212 Cal.App.4th at p. 1499), we concluded that tax increment is similarly derived only for general purposes, and could thus permissibly be reallocated from redevelopment agencies to taxing entities for the general benefit of county residents (*id*. at pp. 1499-1500). We accordingly reject this argument again.

### 2.2 *Section 34179.5 Does Not Violate Article XIII, Section 25.5, Subdivision (a)(7)*

The City contends the electorate, through a 2010 initiative adding article XIII, section 25.5, subdivision (a)(7) to the state charter, prohibited the Legislature from reallocating tax increment from the former redevelopment agencies to taxing entities. The contention, which is not renewed in its reply brief, ignores this court's decision in *Brentwood*.

We determined that this constitutional protection of *former* redevelopment agencies no longer applies after the point at which the Legislature decided that the redevelopment agencies did not have any further authority to exercise redevelopment powers, and thus the withdrawal in 2012 of the authority to enter into sponsor agreements in 2011 was constitutional. (*Brentwood*, *supra*, 237 Cal.App.4th at pp. 499-500.) We thus reject this argument again.

### 2.3 *Section 34179.5 Does Not Violate Article XIII, Section 24, Subdivision (b)*

The City (mistakenly referencing a different initiative) makes an abbreviated claim that the same 2010 initiative, in also adding article XIII, section 24, subdivision (b), prohibited the Legislature from reallocating its general fund to the taxing entities to repay

10

wrongfully diverted and already expended tax increment. As we will explain, while this provision precludes the Legislature from seizing incoming local tax revenues via an administrative process and reallocating them to taxing entities, it is not an obstacle to the pursuit of *judicial* remedies against sponsors wrongfully appropriating redevelopment agency funds.

"[T]he *Legislature* 'may not reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government's purposes.' " (*Bellflower*, *supra*, 245 Cal.App.4th at p. 451, quoting art. XIII, § 24, subd. (b), italics added.) Accordingly, the authorization in section 34179.6 from the *Legislature* for the Department to order diversion of future local tax revenues from sponsors to taxing entities was unconstitutional; the constitutional provision is "a prohibition on transferring away from the local government any tax revenue to which the local government is entitled." (*Bellflower*, *supra*, at p. 453.)

However, we were careful to note that "[*w*]*ithholding* the tax revenue to which the sponsoring agency is entitled is not the only means by which the State can acquire from the sponsoring agency the funds that should [have been] distributed to other taxing entities, if such a result is justified. For example, the State is authorized to obtain *judicial* relief for violation of the dissolution law. (§ 34177, subd. (a)(2).)." (*Bellflower, supra*, 245 Cal.App.4th at p. 453, italics added.)

The import of *Bellflower* is that the Legislature cannot withhold local tax revenues from sponsors through administrative fiat as a remedy for violation of the directives in the Great Dissolution. However, the sponsors are not rendered judgment-proof by virtue of the constitutional provision, such that their general funds are immune from answering for a violation of state law in court. A judgment is not a *legislative* action to "reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use" local tax revenues in the coffers of a sponsor. (Art. XIII, § 24, subd. (b).) The City does not direct us to any

11

indicia in the November 2010 initiative materials that would compel us to infer such a drastic restriction on *judicial* authority in the postdissolution landscape. We decline to do so.

**3.0    To the Extent the City Itself Provided Redevelopment Services (as Opposed to Third Parties with Whom It Contracted), It Comes Within the Exception to Section 34179.5 for Goods or Services**

In *Brentwood*, we concluded section 34179.5 unambiguously "exempts only a transfer of money in exchange for a type of good or service from its ambit. As a result, Brentwood must demonstrate that the payment from its former redevelopment agency comes within this definition." (*Brentwood*, *supra*, 237 Cal.App.4th at p. 502.) Because the payments were *solely* to reimburse the city for its payments for goods or services to third parties, we concluded these did not come within the exception in section 34179.5. (*Brentwood*, at pp. 502-503.)

The City contends payments from the former redevelopment agency for the costs of redevelopment services that City staff provided, as well as for the costs to the City for services that third parties provided, come within the exception. *Brentwood* forecloses the City from receiving payments for the latter; we do not see anything in the cooperation agreement to indicate that the former redevelopment agency was engaging the City's services as a manager for the specific projects involving the third party contracts, or engaging it to execute any redevelopment contracts with third parties in general. The cooperation agreement described itself as simply a "funding mechanism" for future redevelopment work—i.e., a reimbursement agreement for these third party arrangements. However, the City is correct that it was entitled to be paid for the redevelopment work that its *own* staff directly provided; this was not the case in *Brentwood*, a distinction that the Department overlooks. We also decline to accept the Department's suggestion that we should "interpret" the unambiguous section 34179.5 as including a requirement for payments from a former redevelopment agency to be

12

contemporaneous with redevelopment services that a sponsor provided. We therefore will modify the judgment to grant a writ of mandate directing the Department to reduce its determination of the total required reimbursement by $911,495 (the exact figure at issue).

### 4.0  *Bellflower* **Has Established That Section 34179.6 Is Unconstitutional, So the Erroneous Denial of a Declaration in the Present Case Is Moot**

*Bellflower* determined that the remedy provided in section 34179.6, subdivision (h) violates article XIII, section 24, subdivision (b) because it purports to allow the Department to order the reallocation of local tax revenues. (*Bellflower*, *supra*, 245 Cal.App.4th at p. 451.) That decision is now final.

The trial court thus erred in finding to the contrary in denying the requested declaratory relief. However, we cannot assume that the Department will act in disregard of this declaration (indeed, it never acted upon its threats to employ the remedy in the present case), so the issue of a declaration to the same effect in the present case is moot. (*Burke v. City etc. of San Francisco* (1968) 258 Cal.App.2d 32, 34-35.) We therefore decline to modify the judgment to include a declaration of unconstitutionality.

## DISPOSITION

The judgment is modified to grant a writ of mandate directing the Department to reduce its determination of the total required reimbursement by $911,495. As

13

thus modified, the judgment is affirmed.  Neither party shall recover costs on appeal.

(Cal. Rules of Court, rule 8.278(a)(5).)  (**_CERTIFIED FOR PUBLICATION_**)


                                                        BUTZ           , J.


We concur:


        HULL             , Acting P. J.


        ROBIE          , J.