Filed 3/9/21  El Cerrito Redevelopment Agency Successor Agency Successor Agency v. Bosler CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| EL CERRITO REDEVELOPMENT AGENCY SUCCESSOR AGENCY et al., | C078064 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2013-80001671-CW-WM-GDS) |
| v. | |
| KEELY MARTIN BOSLER, as Director, etc., et al., | |
| Defendants and Respondents. | |

In this appeal, we continue our court's consideration of legal issues emerging from historic legislation enacted in 2011 dissolving the state's approximately 400 redevelopment agencies (the Dissolution Law).  The issues in this case stem from a "Cooperation Agreement" between the City of El Cerrito (City) and its redevelopment agency and the assignment of the City's rights and obligations under the agreement to the El Cerrito Municipal Services Corporation (the Corporation), a nonprofit mutual benefit

1

corporation formed and controlled by the City. Based on the assignment, the redevelopment agency transferred certain properties and bond proceeds to the Corporation to complete eligible projects and programs identified in the Cooperation Agreement. The transfers were effected after the passage of legislation dissolving redevelopment agencies but before February 1, 2012, when the redevelopment agency was officially dissolved and its affairs assumed by the City in its capacity as the "Successor Agency." The Department of Finance (Finance) and the state controller (collectively defendants) later reviewed the transfers and, exercising authority conferred by the Dissolution Law, directed the City, the Successor Agency, and the Corporation (collectively plaintiffs) to reverse the transfers. Plaintiffs filed a writ of mandate challenging the decision. The trial court denied the petition. We affirm.

## STATUTORY BACKGROUND

In 1945, the Legislature authorized the formation of community redevelopment agencies and the use of tax increment financing to fund them. Under this financing method redevelopment agencies were entitled to a share of taxes imposed on property within redevelopment areas measured by the property's increase in value after the effective date of an agency's redevelopment plan. The method reflected an assumption that any such increase in property values was attributable to development efforts, and the redevelopment agency should receive the tax increment, which could be used to repay debt incurred to finance the redevelopment plan. Property taxes reflecting the assessed value of the property prior to the effective date of the redevelopment plan were allocated to the other public entities entitled to receive property tax revenue. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 246-247 (*Matosantos*).)

Tax increment financing was a boon to redevelopment agencies, which received 12 percent of all of the property taxes collected across the state (*Matosantos, supra*, 53 Cal.4th at p. 247; Historical and Statutory Notes, 41A Pt. 1 West's Ann. Health & Saf. Code (2014 ed.) foll. § 33500, p. 185), but it disadvantaged schools, special districts, and

2

other taxing entities equally dependent on property tax revenue. (*Matosantos, supra*, at p. 248.) For them, property tax revenue was frozen.

Addressing a state fiscal emergency, and the negative impact of tax increment financing by redevelopment agencies on school finance, the Legislature in 2011 enacted Assembly Bill No. 26 (2011-2012 Ex. Sess.; Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5), providing for the dissolution of nearly 400 redevelopment agencies then in place. (*Matosantos, supra*, 53 Cal.4th at p. 241.) The legislation ultimately became effective on February 1, 2012. (*Id*. at p. 275.)

The Legislature made its intent explicit. Health and Safety Code section 34167 states: "This part is intended to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies so that those assets and revenues that are not needed to pay for enforceable obligations may be used by local governments to fund core governmental services including police and fire protection services and schools. It is the intent of the Legislature that redevelopment agencies take no actions that would further deplete the corpus of the agencies' funds regardless of their original source. All provisions of this part shall be construed as broadly as possible to support this intent and to restrict the expenditure of funds to the fullest extent possible." (Health & Saf. Code, § 34167, subd. (a).)[1]

The Legislature sought to establish a mechanism to ensure that all enforceable obligations of the former redevelopment agencies were paid, but unencumbered assets and revenues would be available to local governments to fund core services. This was not a simple task. While the former redevelopment agencies were legal entities separate from the city or county that sponsored them, they were controlled by the governing body of their sponsors. Control was assured by the overlapping membership of the two

---

[1] Further undesignated statutory references are to the Health and Safety Code.

governing bodies. Reimbursement and funding agreements were often entered into by the same individual decisionmakers, sitting in two different capacities: as board members of the redevelopment agency the city created, and as members of the city council. The statutory scheme dissolving and winding down the redevelopment agencies thereafter swapped a successor agency for the redevelopment agency, but generally the city or county that created the redevelopment agency elected to become the successor agency. (§ 34173.) Thus, the decisionmakers in most cases remained the same—the members of the city council.

Successor agencies, charged with winding down the affairs of the redevelopment agency, are required to "[c]ontinue to make all scheduled payments for enforceable obligations, as defined in subdivision (d) of Section 34167," (§ 34169, subd. (a); see § 34177, subd. (a)(3); *Matosantos, supra*, 53 Cal.4th at p. 275), but are prohibited from taking on new obligations. Successor agencies have an obligation to transfer unencumbered funds to the county auditor, for distribution to the affected taxing entities. (§§ 34177, subd. (d), 34183, subd. (a)(4), 34188; *Matosantos, supra*, 53 Cal.4th at p. 251.)

Nonetheless, sponsoring agencies, usually cities, and their former redevelopment agencies, moved swiftly to lock up "tax increment" to which redevelopment agencies had been entitled before the enactment of this "Great Dissolution." (*Matosantos, supra*, 53 Cal.4th at pp. 243-248; *City of Tracy v. Cohen* (2016) 3 Cal.App.5th 852, 858-859 (*City of Tracy*).) Conscious of this inherent conflict of interest, and the possibility that assets would be transferred from redevelopment agencies to their sponsors and illusory "obligations" would be created to circumvent the intent of the dissolution, the Legislature declared that "agreements, contracts, or arrangements between the city or county, or city and county that created the redevelopment agency are invalid and shall not be binding on the successor agency." (§ 34178, subd. (a).)

4

The Legislature took additional steps as well. It empowered Finance and the state controller to review redevelopment agency transactions to determine whether those transactions gave rise to valid or enforceable obligations. Three review processes were authorized.

**Asset Transfer Review**

The controller's asset transfer review (ATR) applies to asset transfers between a redevelopment agency and the "city or county, or city and county that created" it. (§ 34167.5.) The Legislature found "a transfer of assets by the redevelopment agency during the period covered in this section is deemed not to be in the furtherance of the Community Redevelopment Law and is thereby unauthorized." (§ 34167.5.) If the recipient of such a transfer "is not contractually committed to a third party for the expenditure or encumbrance of those assets" the controller orders those assets returned to the successor agency. (§ 34167.5.)

**Due Diligence Review**

The due diligence review (DDR) requires successor agencies to submit an accounting of former redevelopment agency funds. (§ 34179.5.) The DDR includes the value of assets transferred between January 1, 2011, and June 30, 2012, by the redevelopment agency to the city or county that formed the redevelopment agency. (§ 34179.5, subd. (c).) The DDR identifies assets of the successor agencies that are not encumbered by enforceable obligations or otherwise restricted and distributes them to taxing entities. (§ 34179.5, subd. (a).)

Enforceable obligations for the purposes of the DDR include bonds, loans, payments required by law, judgments or settlements, and certain agreements or contracts. (§§ 34171, subd. (d), 34177, subds. (a)(3), (l)(1).) However, enforceable obligations do not "include any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency." (§ 34171, subd. (d)(2).) The Dissolution Law rendered such agreements

5

invalid and unenforceable against a former redevelopment agency's successor agency. (§ 34178, sub. (a).) Finance must review and approve the DDR and can adjust any amount. (§ 34179.6, subd. (d).)

**The Recognized Obligations Payment Schedule Process**

The recognized obligations payment schedule (ROPS) process is a periodic process that allows successor agencies to pay former redevelopment agencies' approved enforceable obligations. The ROPS covers transactions prior to the Dissolution Law. Finance reviews the obligations listed on the ROPS and approves those items that qualify as enforceable obligations. (§ 34177, subds. (a)(3), (l)(1), (m).)

The property tax proceeds that were previously available to the former redevelopment agencies are now placed into a redevelopment property tax trust fund. (§ 34182, subd. (c)(1).) These funds may be used to pay for approved enforceable obligations listed on the ROPS. (§ 34177, subd. (l)(1)(E).) The remaining funds are distributed to the taxing entities.

The enforceable obligations payment schedule (EOPS) was replaced by the ROPS. The EOPS originally covered claimed enforceable obligation payments through the end of December 2011. (§ 34169, subd. (g)(1)(D).) Subsequent legislation authorized successor agencies to amend the EOPS to enable further payments until the first ROPS was approved later in 2012. (§ 34177, subd. (a)(1).)

**Definition of City, County, or City and County in Section 34167.10**

The ATR, DDR, and ROPS are designed to identify unencumbered assets held by successor agencies to be made available for distribution to the affected taxing entities. All three reference "city, county, or city and county." That definition lies at the heart of this appeal. The Legislature enacted an expansive definition that took into account the realities of the relationships between redevelopment agencies and the bodies that control them.

Section 34167.10 states: "(a) Notwithstanding any other law, for purposes of this part [Part 1.8] and Part 1.85 (commencing with section 34170), the definition of a city, county, or city and county includes, but is not limited to, the following entities: [¶] (1) Any reporting entity of the city, county or city and county for purposes of its comprehensive annual financial report or similar report. [¶] (2) Any component unit of the city, county or city and county. [¶] (3) *Any entity which is controlled by the city, county, or city and county, or for which the city, county, or city and county is financially responsible or accountable.*" (§ 34167.10, subd. (a), italics added.)

An entity "is controlled by the city, county, or city and county," and is "therefore included in the definition of a city, county, or city and county" based on a consideration of the following factors: "(1) The city, county, or city and county exercises substantial municipal control over the entity's operations, revenues, or expenditures. [¶] (2) The city, county, or city and county has ownership or control over the entity's property or facilities. [¶] (3) The city, county, or city and county and the entity share common or overlapping governing boards, or coterminous boundaries. [¶] (4) The city, county, or city and county was involved in the creation or formation of the entity. [¶] (5) The entity performs functions customarily or historically performed by municipalities and financed through levies of property taxes. [¶] (6) The city, county, or city and county provides administrative and related business support for the entity, or assumes the expenses incurred in the normal daily operations of the entity." (§ 34167.10, subd. (b).)

Section 34617.10 also provides: "For the purposes of this section, it shall not be relevant that the entity is formed as a separate legal entity, nonprofit corporation, or otherwise, or is not subject to the constitution debt limitation otherwise applicable to a city, county, or city and county. The provisions in this section are declarative of exiting law as the entities described herein are and were intended to be included within the requirements of this part [Part 1.8] and Part 1.85 (commencing with Section 34170) and

any attempt to determine otherwise would thwart the intent of these two parts."
(§ 34167.10, subd. (c).)

**FACTUAL AND PROCEDURAL BACKGROUND**

**Transactions in Question**

   *Cooperation Agreement*

The redevelopment agency and the City entered into a public improvements and cooperation agreement effective as of February 7, 2011. Subsequently, the parties entered into an amended and restated public improvements and cooperation agreement, effective as of February 22, 2011, (the Cooperation Agreement). Scott Hanin signed the Cooperation Agreement on behalf of both the redevelopment agency and the City.

A memo from City staff to the city council and the redevelopment agency board outlined the purpose behind the Cooperation Agreement: "One way to help protect tax increment revenue is for an agency to enter into an agreement with its respective city whereby the city would implement certain redevelopment projects and programs that the agency would pay for." In addition, "[a]doption of the Agreement will allow the Agency to obligate both exiting Agency funds and future property tax increment funds for reimbursement to the City."

Under the Cooperation Agreement, the City would perform redevelopment work on behalf of the redevelopment agency: "The Parties desire to enter into this Agreement to set forth activities, services and facilities that the City will undertake and make available to the Agency in furtherance of redevelopment of the Project Area and to provide that the Agency will fund or reimburse the City for actions undertaken and costs and expenses incurred . . . in furtherance of the redevelopment of the Project Area."

The redevelopment agency agreed to pay the City funds to be used for projects listed in exhibit A of the agreement. The projects consisted of "various projects and programs the Agency is currently implementing or intends to implement" consistent with the agency's five-year implementation plan.

8

The source of the funds to be paid by the redevelopment agency to the City under the Cooperation Agreement included certain available funds, bond proceeds, and future tax increment revenue. These funds were to be used exclusively for the completion of projects in accordance with the Cooperation Agreement. All unencumbered and future redevelopment agency funds were promised to the "various projects and programs the Agency is currently implementing or intends to implement."

*Assignment Agreement*

On March 7, 2011, the City and the Corporation entered into an assignment agreement regarding the Cooperation Agreement. In the assignment agreement the City assigned to the Corporation all its rights, title, interest in, and obligations under, the Cooperation Agreement excluding affordable housing projects. The City assigned to the Corporation the right to receive payments from the redevelopment agency to complete eligible projects and programs. The Corporation agreed to accept the City's obligation to complete these projects and programs.[2]

*Asset Transfers*

On March 9, 2011, the redevelopment agency transferred $400,243 in bond proceeds and $950,649 in cash to the Corporation. On March 21, 2011, the redevelopment agency approved a resolution to transfer four properties to the Corporation pursuant to property conveyance agreements. The transfer was effective March 22, 2011; the properties transferred were valued at $10,168,319.

Subsequently, on January 6, 2012, the redevelopment agency transferred $631,340 to the Corporation. On January 31, 2012, the redevelopment agency transferred $400,000 to the Corporation. The redevelopment agency was dissolved on February 1, 2012.

---

[2] The City formed the Corporation in 1982.

**Department and Controller Administrative Determinations**

*EOPS and ROPS Determinations*

Prior to dissolution, the redevelopment agency submitted its original EOPS to Finance in August 2011, for enforceable obligations due from August through December 2011. The following January, the redevelopment agency submitted an amended EOPS for enforceable obligations from August 2011 through June 2012. The redevelopment agency listed the Cooperation Agreement as an obligation with a total value of $156,930,000 on both EOPS submissions. The redevelopment agency listed on the amended EOPS $1,835,010 in obligations due through the end of the fiscal year 2011-2012. Finance did not seek review of either submission.

The Successor Agency listed the Cooperation Agreement in its ROPS submissions for each of the six-month periods from January 1, 2012, through July 1, 2013. Finance disallowed all of the items, finding they were not enforceable obligations since it was a contract between the redevelopment agency and the City.

*Finance's DDR Determinations*

In May 2013, Finance issued its initial DDR for the former redevelopment agency's nonhousing funds. Finance required the Successor Agency to remit $1,981,989 that had been transferred to the Corporation under the Cooperation Agreement between the City and the former redevelopment agency. Finance concluded that the Cooperation Agreement was an agreement between the redevelopment agency and the City, because section 34167, subdivision (a)(1) defines city to include any reporting entity for purposes of the city's annual financial report. Finance concluded the Corporation was a component of the City in its consolidated annual financial report. After meeting with the Successor Agency about its initial DDR determination, Finance confirmed its findings in its final DDR determination.

10

*Controller's ATR Order*

In April 2012, the controller ordered cities, counties, and agencies in receipt of assets transferred from a redevelopment agency after January 1, 2011, "to immediately reverse the transfer and return applicable assets to the successor agency of the relevant redevelopment agency."  The controller's order "directly applies to economic development corporations, joint powers authorities, or other public agencies that received assets, directly or indirectly, from a redevelopment agency after January 1, 2011," and that the controller would "review and audit cities, counties, and public agencies to ensure that all applicable asset transfers have been reversed" pursuant to section 34167.5.

## PROCEDURAL BACKGROUND

Plaintiffs filed a petition for writ of mandate and complaint for injunctive relief alleging Finance and the controller abused their discretion by improperly applying the Dissolution Law.  Plaintiffs also argued the law itself violated various constitutional provisions.  The petition challenged the constitutionality of the sales tax and use tax offset remedy in the Dissolution Law.  (§ 34179.6, subd. (h).)

Following a hearing, the trial court denied the petition.  The court upheld Finance's and the controller's actions under the Dissolution Law.  The court denied plaintiffs' request for declaratory judgment that the DDR is unconstitutional under Proposition 22 (as approved by voters, Gen. Elec. (Nov. 2, 2010).)  However, the court also issued a declaratory judgment that the sales tax and the use tax offset provision of section 34179.6, subdivision (h)(1)(C) is facially invalid under the California Constitution, article XIII, section 24, subdivision (b).  The court enjoined Finance from threatening or ordering sales and use tax offsets in relation to the transactions at issue.

Following entry of judgment, plaintiffs filed timely notices of appeal.

## DISCUSSION

We review issues concerning the interpretation of dissolution legislation de novo. (*City of Tracy, supra*, 3 Cal.App.5th at p. 860; *City of Brentwood v. Campbell* (2015)

11

237 Cal.App.4th 488, 500 (*Brentwood*).) We review Finance's factual determinations and conclusions under the Dissolution Law under the substantial evidence standard. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427, 435; *Schwartz v. Poizner* (2010) 187 Cal.App.4th 592, 615-616.)

**Section 34167.10 and Retroactivity**

Plaintiffs argue the Cooperation Agreement entered into between the City and the redevelopment agency predates the enactment of section 34167.10 and therefore the trial court erred in applying the statute's definition of "city" retroactively. According to plaintiffs, the trial court departed from fundamental principles of retroactivity that have been consistently applied by the courts.

*Background*

The trial court determined the Corporation fell within the scope of section 34167.10's definition of "city, county, or city and county": "The fact that all of the Corporation's directors and officers are City officials or employees, in conjunction with the evidence showing that the Corporation routinely grants the City's requests for funds, tends to show that the City can, and does, exercise substantial, even complete, control over the Corporation. Certainly there is no evidence that the Corporation ever engaged in independent activities or in activities that were not in the City's interest." The court found substantial evidence that the Corporation fell within the scope of section 34167.10, subdivision (a) because it was included as a reporting entity in the City's annual financial reports for three years prior to Finance's DDR determination. These reports indicated the City " 'is financially accountable' " for the Corporation, bringing the Corporation within the scope of section 34167.10, subdivision (a)(3).

In addition, the court found several indicia of control under section 34167.10, subdivision (b) including substantial municipal control, common overlapping boards, involvement in the creation of the entity, and provision of administrative and business

12

support for the entity. Therefore, the court considered the Corporation to be the City for purposes of the redevelopment dissolution laws.

The court noted all the transactions at issue were completed before Assembly Bill No. 1484 (2011-2012 Reg. Sess.) containing section 34167.10 became effective. Therefore, Finance's contentions were sustainable only if section 34617.10 operates retroactively. The court determined the context of the Dissolution Law revealed the Legislature intended section 34167.10 to apply retroactively, noting that "[t]he intention to make a statute apply retroactively may be inferred from the legislative history or from the context of the enactment. (See, *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1210.)"

### *Discussion*

We addressed the issue of retroactivity in *Brentwood*, where the city argued the Constitution prohibits retroactive invalidation of agreements while the redevelopment agencies were still in existence. The city also claimed Finance misinterpreted the DDR statutes by applying them retroactively. We found the Legislature intended to abrogate the agreements retroactively. Such retroactive application fell within the Legislature's power to dictate the manner in which redevelopment agreements would end. (*Brentwood, supra*, 237 Cal.App.4th at pp. 499-500; see also *City of Tracy, supra*, 3 Cal.App.5th at pp. 860-861.) In the present case the trial court correctly concluded the definition of city in section 34167.10 applies retroactively.

**Impairment of Contract**

The Corporation argues retroactive application of section 34167.10 constitutes a severe impairment of the Corporation's contract rights. The Corporation also contends it has standing to challenge Finance's attempt to unwind the assignment agreement.

The trial court concluded the Corporation lacks standing to raise an impairment of contract claim because it is "acting as a political subdivision of the State for purposes of carrying out redevelopment work." Under the trial court's reasoning, the Corporation's

13

contract impairment claim relates to a contract under which the Corporation performs functions delegated to it by a political subdivision of the state. This posture deprives the Corporation of standing.

Political subdivisions of the state have no standing to invoke the federal or state impairment of contract clauses. (*Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6-7; *Cox Cable San Diego, Inc. v. City of San Diego* (1987) 188 Cal.App.3d 952, 967.) In *Cox*, the court found that a city, as a political subdivision of the state, a municipal corporation, acting in its legislative, governmental capacity, has no standing to raise the defense of impairment of contract in opposition to acts of the state Legislature. (*Cox*, at p. 967.)

In the present case, under the assignment agreement, the Corporation was to perform redevelopment work originally meant to be carried out by the redevelopment agency. The record reveals that the assignment agreement was intended to allow the Corporation to perform redevelopment work formerly carried out by the redevelopment agency, using tax increment formerly allocated to the redevelopment agency. We agree with the trial court's assessment: "In essence, the Corporation is acting in this case as a political subdivision of the state by accepting an assignment of the City's contractual duties to carry out redevelopment work under the Cooperation Agreement."

When a political subdivision assigns its functions to a nonprofit corporation, any limitations or requirements applicable to the political subdivision also apply to the nonprofit. In support of its finding that the Corporation lacked standing, the trial court referenced an Attorney General opinion which found a nonprofit performing redevelopment work delegated by a redevelopment agency is not exempt from the statutory requirements applicable to the redevelopment agency. The trial court determined that "statutory requirements applicable to redevelopment agencies may not be avoided by delegating administrative responsibilities to a nonprofit corporation subject to [the agency's] control." According to the trial court, "when a nominally independent

14

nonprofit corporation acts as a surrogate governmental agency, it is subject to the laws that apply to governmental agencies."

We agree with the trial court's reasoning regarding standing. The "Corporation 'stepped into the shoes' of the City as a political subdivision of the state for the purposes of carrying out redevelopment work." Given the relationship between the City and the Corporation, the Corporation is subject to the same prohibition against invoking federal or state contract clauses that apply to the City, and lacks standing to pursue its impairment of contract claim.

**Proposition 22**

Plaintiffs contend the DDR process violates Proposition 22. Proposition 22 added section 25.5, subdivision (a)(7) to article XIII of the California Constitution, which provides in part: "The Legislature shall not . . . require a community redevelopment agency . . . to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property pursuant to Section 16 of Article XVI to or for the benefit of the State, any agency of the State, or any jurisdiction." Jurisdiction is defined in Proposition 22 as a city, county, special district, school district, or community college district.

The trial court rejected the Proposition 22 claim, noting the DDR does not require a community redevelopment agency to make any payments or transfers of its property or tax revenues. Instead, the statute directs a successor agency to recover funds from the former redevelopment agency's sponsor city after the dissolution of the redevelopment agency. According to the trial court, "the most significant factor is the fact that the [redevelopment agency] no longer exists, but has been dissolved by operation of law through a statutory scheme that has been upheld by the California Supreme Court against various constitutional challenges, including arguments based on Proposition 22."

We agree. In *Brentwood*, we considered whether the DDR audit process was an attempt by the Legislature to improperly distribute tax increment. In rejecting this

15

argument, we observed that although the Legislature could have immediately dissolved the redevelopment agencies it had the power to instead implement an orderly wind-down: "Had the Legislature been willing to . . . [citation], it could have immediately dissolved redevelopment agencies without a freeze period (as chaotic as that would have been) . . . [citation], and invalidated sponsor agreements as of that date. Nothing in [*Matosantos*] would have prevented this action. The Legislature's choice to do so with retroactive wisdom is therefore equally constitutional because it does not reflect redirection of tax increment in the coffers of a viable redevelopment agency of indefinite existence." (*Brentwood, supra*, 237 Cal.App.4th at pp. 499-500.) Accordingly, the trial court did not err in finding the DDR process does not violate Proposition 22.

**January 2012 Payments to the Corporation**

Finally, the City and Successor Agency argue that the redevelopment agency's January 2012 payments of $631,340 and $400,000 to the Corporation were valid when they were made because the definition of enforceable obligation includes "[a]ny legally binding and enforceable agreement or contract that is not otherwise void as violating the debt limit or public policy." (§ 34167, subd. (d)(5).) According to the City and Successor Agency, the revised definition, section 34171, subdivision (d)(2), which excludes from the definition of enforceable obligation contracts between redevelopment agencies and the cities that created them does not apply to the EOPS. The revised definition did not become effective until February 1, 2012. Therefore, the January 2012 tax increment payments were valid.

However, the City and Successor Agency's argument assumes that the EOPS process was final, making transactions that took place prior to the redevelopment agency's dissolution insulated from review or reversal. As the trial court pointed out the EOPS process "was an interim process that was replaced by the ROPS and DDR processes, and does not govern those later processes." Once the ROPS process took effect, the definition of enforceable obligation that excludes contracts between

16

redevelopment agencies and creator cities also took effect. Under section 34177, subdivision (a)(1), payments associated with obligations excluded from the definition of enforceable obligations by section 34171, subdivision (d)(2) are excluded from the EOPS and removed from the last schedule adopted by the redevelopment agency. As the trial court determined, payments under the redevelopment agency and sponsor city agreements are "properly listed on the [redevelopment agency's] EOPS and paid during the interim period prior to [redevelopment agency's] dissolution, but . . . all such payments were subject to review and reversal through the DDR process."

## DISPOSITION

The judgment is affirmed. Defendants shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
RAYE, P. J.



We concur:



/s/
MAURO, J.



/s/
HOCH, J.

17